oral argument 30 minutes per side. Mr. Bailey for the petitioner. Mr. Bailey, it's my understanding that you and Mr. Hackett are going to split your time. Is that correct? Yes, your honor. And you're going to take 14 minutes. He'll take 12. And you each are reserving two minutes for a vote. Right. With the court's permit, and we'll each take two minutes for a vote. We'll each take 14 minutes and each of us will reserve one minute for rebuttal. Okay. All right. Well, you may proceed. Thank you, your honor. May it please the court. John Bailey and Bruce Hackett on behalf of Andy. We do appreciate the court. And I intend to. We're losing his. He's cutting in and out on us. Council Bailey, can you hear me? Okay. I can. Should I try again? Yes, sir. Bailey and Bruce Hackett on behalf of Randy height and we appreciate the court allowing us to divide our argument. I intend to address the issue of trial counsel's failure to remove for cause your goal. And if time permits, trial counsel's failure to conduct a competent mental health evaluation and present compelling evidence. Also, it is judge Rogers. If you could advise, identify those issues by number, it'd be easier for me to get to my notes in the briefing. It's issue 1 and issue 3. Thank you so much. And Mr. Hackett intends to address issue 9, ineffective assistance of appellate counsel for failure to raise the trial counsel's refusal to give a required lesser included instruction. And if time permits. Issue 10 trial counsel's failure to consult with Randy height and request a wanton murder instruction at trial. Thank you. With regard to the issue of juror. Respectfully, throughout the pendency of this case, up to and including its response brief before this court. And just recently, the supplemental authority it filed. The warden has mischaracterized your responses in this case. Just within the last week, the warden said that he would not give serious consideration to Randy heights primary mitigating evidence. Previously, the warden has argued that your goal would be reluctant to consider it or that it. He didn't think much of the mitigating evidence in question. That is not what your gossip, both in response to questions from defense counsel and the trial prosecutor. Juror golf flatly stated that he would not consider Randy heights primary mitigating evidence. And by the way, the warden has raised an issue that trial counsel for the defense ask improper questions. That's not correct. They were perfectly proper questions and much more importantly. The most damning answer given by was in response to the trial prosecutor's question. The trial prosecutor in this case, when, when questioning did what any experienced trial capital trial attorney can easily understand in trying to advocate on behalf of the Commonwealth and asking a question that she felt. Sure. She knew the answer would be your golf and she first tried to give one more chance to say that you would consider Randy heights mitigating evidence when your gossip. No, I will not consider that. The trial prosecutor said, well, you would listen to it at least. And said, no, I will not list mitigating evidence. That's what what we're talking about here is one particular part of the mitigating evidence. Not a refusal to hear all to listen to and consider all the mitigating evidence. Correct? Well, the evidence in question is what Randy heights trial counsel term, the main thrust of Randy heights mitigation case. So, well, it was his family background, but he was asked about other things. Correct? There was a label it mitigation evidence. That's just a tiny bit of an overstatement. Correct? I'm sorry I said, it's a tiny bit of an overstatement to say, it's all the mitigation evidence. No, it was the most important mitigating evidence. I apologize if I said that refused to consider all mitigating evidence. He only refused to consider or even listen to the most important case. And in point of fact, that alone disqualifies from Randy heights capital trial. Both this court, and the United States Supreme Court stated unequivocally that a juror may not be precluded from considering and may not refuse to consider mitigating evidence. That's any mitigating evidence specifically stated that he would refuse to consider would not even listen to the specific mitigating evidence that Randy was basing his case for a life sentence. So, under precedent from both this court, and the United States Supreme Court, that makes a biased juror. And this court has stated and to at least two cases, we cited Miller versus web and Hughes versus United States that it is ineffective assistance of counsel. And prejudice is presumed and a new trial is required when our counsel allows a biased unqualified juror to sit on a case. That's exactly what happened in this case. And we know that because the trial prosecutor stated that was unequivocal. That's the word used by the trial prosecutor unequivocal and no refusal to consider or even listen to Randy primary mitigating evidence and whatever spend the warden puts on that. Now, the trial, it was the trial prosecutor who was there. Listen to observe. I would like to move from that argument into a discussion about that mitigating evidence itself. I have some concerns about the importance of this 1974 report regarding mental incapacity or organic brain damage that was not discovered despite effort by trial counsel until the middle of the trial itself. Can you can you explain the importance of that document in this case. Yes, the only thing that I would say about your honors question is, I'm not sure that it can be fairly characterized. The trial counsel did make an effort to uncover this particular type of mental health evidence talking about organic brain damage. That's what the 1974 report indicated. The only expert that trial counsel retained in this case, a clinical psychologist is really beyond any reasonable dispute. Clinical psychologist is not qualified by training or expertise to diagnose organic brain damage. That's a matter of medical literature. There's just there's no mistaking that fact. So, the only expert retained by trial counsel could he wasn't qualified to determine that Randy Hyde had organic brain damage. I compare the 1974 report, which your honor reference was by three mental health experts, including a psychiatrist who is specifically qualified by training and expertise to uncover organic brain. Here's what I'm struggling with. The counsel finally gets this report in the middle of trial, and it provides it is a report that was actually ordered by another judge to be undertaken. And yet what we have is a question of whether it was ineffective because counsel didn't find other experts or you also argue for trial error. But in both of those circumstances, I'm a little bit concerned that funding was never made available for counsel to find other experts on organic brain damage. By my look at the record, it was after trial, straight on through, he was denied funds before trial because of the pending claim about the specific agreement that he had entered. And then after trial, he was denied funds, period. When did Mr. Hyde have an opportunity to develop that claim? Never. Your honor is 100% correct. Both pre-trial and after trial in the trial court, excuse me, in the post-conviction court, as your honor indicated, up to and including the federal habeas corpus court. Mr. Hyde has attempted to obtain the funding to get experts who would be qualified to determine what every doctor who has looked at Mr. Hyde's records presumes is the case. That he has organic brain damage. And as I'm sure your honor knows, that is a significant piece of mitigating evidence. It's been termed by the United States Supreme Court to be super mitigation. This court has held that it is the type of mitigation that can impact a juror's determination of whether a life sentence or the death penalty is the appropriate punishment in a case. How can it be ineffective assistance if counsel sought funding and was denied? Counsel did not do a complete mental health workup, which is the standard of care. And it's a matter of the ABA guidelines, which have been adopted by the United States Supreme Court. So, is the standard, the requirements that he reached into his own pocket to fund the expert? If the court denies it? We did and habeas your honor. But what the trial counsel never asked for the court to appoint the right type of expert who could diagnose organic brain damage until the trial court said it was too late. Now, as judge says, we take issue with the trial court's determination that it was too late. But if the trial court was right about that, that it was too late, it was ineffective assistance of counsel not to have asked for it before. That's what any competent capital defense attorney has to do, a complete mental health evaluation. And that's not just a clinical psychologist who is not qualified to determine a wide range of mental health issues, but certainly organic brain damage, which is what is issue specifically here. No, go ahead. I'm struggling with the denial of the 18 U.S.C. 3599 funding by the court. It seems to me that the standard is whether services are reasonably necessary for the representation of the defendant, including as to the sentence. And yet what we have is continual refusal by the trial court, it's your claim 31, to award any fees for requested experts regarding brain damage as mitigation. Exactly right. The trial court, the post conviction court, and the federal habeas corpus district court. And we provided, as judge Gibbons alluded to, we provided declarations from three highly qualified experts. We looked at an enormous amount of records in Randy Hyde's case and had no doubt that further testing would confirm what they could tell from the reports that they did review. And that's that Randy Hyde suffers from organic brain damage. And, yes, judge, that is exactly correct. That has never put before any court, much less the jurors who considered what sentence to impose on Randy Hyde at trial in this case. So, what's the appropriate remedy if that's the case? Is it a remand to the habeas to the federal district court? The determination is that the federal habeas corpus district court should have provided the expert funding requested, then yes. Well, I have another question for you, and you may not have thought about this or know the answer. I certainly don't. But has there been any change or evolution of our understanding about the effects of brain damage on behavior since 1980? Whenever, whenever the trial was, the offense was in 85. I'm not sure when the trial was. 94. I see that I'm out of time, but with, of course, permission, you can answer that question. The answer is, yes, your honor there. There have been new studies, new determination and new information that has come to light as recently as the past decade about the effects of organic brain damage. There are, I'm sure your honor is familiar with the there have been quite a few through certainly my legal career. And, yes, that is. How does that how to changes in the state of knowledge affect how we view councils decision making? I mean, we can't judge him back today standards. Can we. But organic brain damage was very well understood in the 1980s to be significant. But that was what I was asking you. I apologize. Medical rather than the legal. So, I misunderstood the medical definition. Yes, have evolved and gotten even stronger. The legal definitions were well understood. Well understood. In fact, we cited to an affidavit that Mr. Heights trial counsel provided in another capital case talking about the significance of organic brain damage. He knew it at the time. Counsel knew it at the time. And certainly Mr. Heights trial counsel knew it at the time as he testified in another case. We presented that to the court. Okay. Thank you for his indulgence in allowing me to answer. And. Could I ask a short clarifying question that wouldn't take away from his time? Yeah, I'm sorry. Would that be all right? We move now from issue 1 to 2, which subsequent issues are my. Requirement that I get or is this now issue for. Issue 3 issue 3, but issue 3, I thought was a was a ineffective assistance of counsel. Issue 3 is an effective assistance of counsel. This is not an effective assistance of counsel argument that you most recently can discuss. And is that correct? We've also talked about trial counsel's failure to appoint a qualified expert and the federal district habeas corpus courts failure to those were also 3. And 5. Yeah, I thought the trial court's error was claim 31. And my other question is, is that subject to the difference or not? Well, yes, but that's all I ask. But may I discuss that? Well, if you want to take some of your time, I just want to know which characterization we were dealing with. I wouldn't. This is an important text. I would like to hear the response. If I might judge Gibbons to the Cohen versus pinholster ed per rule, particularly in light of that court's ruling that if there's not an adjudication on the merits, then if it doesn't apply. Can you? Yes, you can answer that. I'll do it very quickly. Judge Gibbons, the Kentucky Supreme Court stated the clinical forensic psychologist who examined Randy height in preparation for trial specifically found no evidence that height was psychotic or from any serious neurological deficit or was otherwise retarded. They further stated appellant had full benefit of mental health evaluations and experts and there was abuse of discretion and trial court's failure to order. That is twenty eight U. S. C. twenty two fifty four D, two error. That's an unreasonable application of the facts. Courts are required to engage in the facts and apply clearly established federal law. The Kentucky Supreme Court did not do that. It's absolutely incorrect. It's incorrect. It's a matter of fact and a matter of law to say that Randy height had the full benefit of a mental health evaluation when he had one psychologist who was not qualified, trained, did not have the expertise to diagnose organic brain damage, which is a significant mitigating factor that every qualified doctor who Randy height has determined that he suffers from. So that is not a decision by the Kentucky Supreme. Thank you. Required or should be given. And thank you for your. All right, Mr. Hackett. Thank you, Your Honor.   I would like to address argument nine in our brief. It was claimed forty three in the district court and it's contained in our brief at pages one eighty four to two thirteen. The issue is the ineffective assistance of appellate counsel for failing to raise on direct appeal a winning issue. The issue being that Mr. Height should have had a theft instruction that jury instruction as a lesser to the robberies. And of course, the robberies were one of two aggravating circumstances that made him eligible for the death penalty. The ineffective assistance of appellate counsel issue was not raised in Mr. Heights initial post conviction motion. And the district court found that the claim was procedurally defaulted. The warden also argues that it's defaulted. Mr. Heights, when he filed his petition in district court, identified for the court two issues that had not been exhausted. This was one of them. And Mr. provide a forum for him to litigate his ineffective assistance of appellate counsel issue. Shortly after filing his petition, he filed a motion to stay and obey his habeas petition and go back to go back to state court to exhaust two claims of ineffective assistance of trial counsel. Those issues were pending in Jefferson circuit court. At the time, he filed his petition over the warden's objection. He was permitted to do that. He went back to the state court and through the Kentucky Supreme Court. The Kentucky Supreme Court agreed with the Jefferson circuit court that the courts had no jurisdiction to hear those pending claims. Mr. Hackett, I'd like to fast forward a little bit on this issue. At the end of the day, tell us what your position is. I mean, unless you're included, it would only have to be charged if the jury could reasonably have found that lesser included offense based on the evidence presented. That may be paraphrasing a little bit, but tell us how you think at the end of the day. Mr. Hey, could have been successful in obtaining that charge. Yes, your honor. Our position is that that particular issue on appeal on direct appeal was a winning issue. I think the best evidence of that is the Raymond McClellan case. I'm sorry. Well, I'm not really interested in cases. I want you to talk about the evidence and how, based on the evidence here, the jury might reasonably have found this lesser included defense. Yes, your honor. Mr. Height testified. He was asked whether he intended to rob these two victims and he said, no, he did not based on his testimony. He was entitled to the lesser offense. And here's why the, the offensive robbery requires that the physical force in this case, the deadly physical force be used with the intent to commit the theft. His testimony was that he did not have that intent to commit the theft. I referred to the McClellan case because McClellan was another capital case and he, his aggravator was first degree burglary, much like first degree robbery. There are three elements that raise a robbery to first degree and a burglary to first degree. It's the possession of a deadly weapon, the use of a dangerous instrument, or the use of physical force against the victim. In Mr. McClellan's case, Mr. McClellan persuaded his wife to come back to him. She had left and gone to live with a former husband. Mr. McClellan bought a gun two days before the killing. He rented an apartment in the same building as his wife and her ex-husband. He waited there until they returned at night. He went to the door and knocked on the door. The victim answered, Mr. Stutzenberger answered, slammed the door, Mr. McClellan shot the lock off the door, went into the apartment. The important issue there was that he entered or remained in the dwelling with the intent to commit a crime. Mr. McClellan testified, I did not intend to commit a crime inside. All I wanted to do was talk to my wife. We think that the testimony of Mr. McClellan in his case was reversed. He got a new trial based on that testimony because he should have had a trespass instruction based on his testimony. It is the testimony of Randy Hite which entitles him to the lesser instruction. The magistrate judge initially, when making recommendations on the motion for discovery or the motion for an evidentiary hearing or both, made the mistake of saying the trial judge judged the credibility of Mr. Hite and found that he wasn't entitled to the instruction. That is not permitted at all. A judge cannot judge credibility. A judge obviously could not say, well, you said you were acting in self-defense, but I'm not going to give a self-defense instruction because I don't find your testimony credible. It just can't be done. The warden seems to be making the same sort of argument in this appeal when he refers to Mr. Hite's testimony and says it is meaningless and rang hollow on page 81 of his brief. As I said, that is just simply wrong to say that a judge, when it comes to instruction time, could judge a person's credibility and say, no, you may not have that instruction. As far as the procedural default of this claim, what Mr. Hite is asking for is the same, I guess, the same treatment that Mr. Boykin, Mr. Matthews, Mr. Halverson, and Mr. Polini got in their cases in this court. Each one of them did not raise the issue of ineffective assistance of appellate counsel in the state court. And each one of them was allowed to present the claim to this court and get a merits ruling on the underlying issue. And that's what Mr. Hite is also asking. Of course, the reason why there was a problem in state court with Mr. Hite presenting the issue is that the case of Lewis v. Commonwealth said that ineffective assistance of appellate counsel was not a cognizable issue in Kentucky. That case came after a case by the name of Hicks v. Commonwealth, where the Supreme Court of Kentucky said that a litigant could, if they lost their appeal completely, if their appeal was dismissed, if the appellate court never got to the merits of the appeal, then that person could get relief in the appellate court, could get a belated appeal. But a person whose case was briefed and got a ruling on the merits of the issues could not present a claim of ineffective assistance of appellate counsel to the Kentucky courts anywhere. All courts lacked jurisdiction until they changed their mind in 2010 with the case of Holland v. Commonwealth. When the Kentucky Supreme Court decided Holland, one of the things that they said is, we are going to permit that ineffective assistance of appellate counsel issues. We're going to allow them to be raised. They set out the procedure by which they could be raised. They amended Kentucky's post-conviction criminal rule to accommodate the newly recognized claim. But then they said, we don't have to apply this decision retroactively. And one of the reasons why they said it didn't have to apply retroactively was that, and I quote from the case that, quote, the federal courts have provided a forum through habeas review, C. Boykin v. Webb. Kentucky defendants have not, therefore, been denied an opportunity to vindicate their right to effective appellate counsel, and there is thus no need for our decision today to reach back and operate retroactively, end quote. So we are asking this court to allow Mr. Hite to present the merits of his claim to the court and to get a merits ruling. And if the court has no questions, I believe that's all I have at this time. Are there further questions? All right, Mr. Kriegel, Kriegel, tell us how to pronounce it. Mr. Kriegel, thank you. May it please the court, my name is Matthew Kriegel. I'm from the Kentucky Attorney General's office, and I represent the warden in this matter. May it please the court, Mr. Hackett, Mr. Bailey, just two months shy of 36 years ago, on August 22nd, 1985, Randy Hite killed two people in cold blood. Patricia Vance, a 33-year-old mother of two, and David Omer, a 40-year-old father of three, were gunned down in a most vulnerable state when they presented absolutely no threat to Mr. Hite. Horrible, senseless, tragic were the words used by defense counsel when this trial opened, as it was made crystal clear that this case was not a whodunit. Hite, who between the ages of 18 and 41, had managed to spend approximately two years outside a prison cell, admitting to killing two innocent people. It's against this backdrop that I appear before you today. I'll address the issues in the same order that they were addressed by my opponents, and start with ineffective assistance of counsel as it relates to juror Leroy Gahl, and the failure to strike him for cause. Before we go through that, I would like you to address the issue of this 1974 report. Your opening got it exactly right. It said, this is a man who has spent all of his life up to this crime, effectively in prison, and a man who a state court judge, an Ohio state court judge, said when he was 21 years old, I want this man evaluated. And they appointed three experts to evaluate his mental health and potential brain damage. Why isn't that just a key document here? You say Hite failed to make even a rudimentary showing that further evaluation was necessary. How can that 1974 report be more than a rudimentary showing that he needed an expert? Your Honor, it's because the report only noted the possibility of brain damage, and when analyzing the issue as it's framed before us today, specifically ineffective assistance of counsel with respect to his investigation and preparation for mitigation, you would look at what he did to uncover that report. And it's apparent from the beginning that there were a lot of issues that the defense counsel had no control over. In particular, that report was 21 years old by the time it was provided. And it was found on microfiche by one of the investigators mid-trial. And again, it only dealt with the possibility of brain damage, which was directly contradicted by the expert that was appointed for Mr. Hite, Dr. Fisher. And Dr. Fisher was a Harvard-educated forensic psychologist with expertise in criminal cases. He was a Duke professor. Your counsel said that a forensic psychologist is not what was needed in this case. It was a neurologist. I apologize. I didn't mean to interrupt. He's saying that the forensic psychologist couldn't properly diagnose it, but he could certainly have determined the need for additional testing. And he did note that in his report. He said there are no signs of neurological deficits, no signs of intellectual disability, no signs of psychosis. And that was consistent with the other reports that were available from Dr. Gusset, who did an evaluation on Mr. Hite when he was 14 years old. So, again, we're looking at it through the lens of AEDPA deference in the context of what sort of investigation the defense counsel did and what could he have done differently. In getting this report mid-trial, he immediately moved to get an additional expert, and that motion was denied. But that's the other side of this argument. If we set aside for a moment the ineffective assistance of counsel argument and look instead at the claim of court error for failing to authorize funding to do this examination, then you fit, don't you, within ACCI, which in 2017, the Supreme Court in McWilliams v. Dunn said ACCI is clearly established law for AEDPA purposes. And it holds that indigent persons presenting credible evidence of brain damage are entitled to state funds for further investigation. Why doesn't a report from 1994 by three experts that was ordered by a court to be undertaken that says that there are underlying schizophrenia, there is cortical dysfunction, there is underlying psychosis, delusions, borderline retardation, and the likelihood of drug dependency? Why isn't that sufficient to show, particularly in light of the other analyses that said that this young man's IQ declined while he was a young man, which is further evidence of organic brain damage, why isn't that sufficient to fit within ACCI and require the court to authorize funding? Because the court had already authorized funding and provided Mr. Haidt with an expert that directly contradicted that report. And in particular, again, that report only referred to the possibility of brain damage. It didn't establish even a probability of brain damage. It spoke only to a possibility. And so there wasn't any concern with a violation of the requirements of ACCI such that the trial court had failed to consider mitigation evidence. And then you have to look at this case, again, from the standpoint of a global perspective. And in this particular instance, it would have been impossible to show lack of prejudice here or to prove prejudice. I think the question here, I'm not, you're going to have to explain to me why there is this prejudice argument that you're raising when what we are talking about is a violation of 18 U.S.C. 3599F, a request for an individual's habeas petitioners, where it is reasonably necessary for representation of the defendant related to his sentencing included, that he authorize these services. And my look at this case is that counsel asked over and over and over for funds for this type of expert. Beginning in 85, he was blanketly denied the funds because there was the other pending settlement issue. Then at trial, he requested, after trial, he requested when he got this report and he was denied by the trial court, he was denied by post-conviction, and he was denied by the habeas court. When did he ever have an opportunity to receive funding for the experts that were requested regarding organic brain damage? He was allowed to do that when the Height v. Williamson, Height 2 case was completed. And unfortunately, the expert that was originally going to examine him, for whatever reason, declined. And so counsel had to find a new expert. I'm struggling with that answer because that was before he had the 1974 report. And that is where he had three experts. The question being, wasn't that reasonable evidence and information that should have justified the appointment? From the date he received that, I think it was January 22nd of 1994, when did he ever have funding to hire a neurological or brain damage expert? I can't find anywhere in the record that he did. He had already received that funding, which was how Dr. Fisher was hired. If we're talking about 3599, my position is that Cullen v. Penn Holster prevents it because the claim was adjudicated on the merits and you don't take new evidence at this point when that's occurred. But if we're talking about at the actual trial, when the 1973 report was finally unearthed, again, the possibility of brain damage, which was directly contradicted by the expert that had already been appointed, when that came about, that didn't necessitate the need for an additional appointment of an expert. And again, you're still going to have to look at this through the lens of what sort of – is there any prejudice here? You've got a defendant who has literally been a career criminal. By the time the sentencing phase began, he had been convicted of 24 felonies. He had committed crimes from the moment he escaped from the Johnson County Jail – burglaries, robberies, an attempted murder on a Kentucky State police officer. Of course, the underlying facts of this case, he approached a car with two guns, one in each hand, cocked and loaded. He murdered two innocent people at point-blank range in cold blood while they were in the back of a station wagon sharing an intimate moment on a country road. Judge Rogers, how does that go to the question of whether he should have been granted funds to show organic brain damage? I'm not sure what inorganic versus organic brain damage is, but apart from that, presumably, if you have the organic type, it's going to be more sympathetic to the jury than if you have the inorganic type. Is that the idea? I'm not sure, Your Honor, but it goes to the issue that my opponents were attempting to raise, at least within the framework of claim number three, whether or not there was ineffective assistance of counsel related to the presentation of mitigation. I understand that, but I perceive Judge Strange to be raising some difficult issues that don't deal with ineffective assistance of counsel, but rather deal with error that either isn't subject to AEDPA or passes the AEDPA standards of the courts in denying or not providing funding that goes to organic brain damage. I don't want to characterize my colleague's inquiry, but if that's the nature of her inquiry, then I'm just curious to know what your response to that is. And when you say, well, this is an egregious crime, that is a response, but I'm not sure it goes exactly or directly to the question of whether, in his defense of that, he might have gotten some slight modicum of additional sympathy if the jury had known that he had organic brain damage as opposed to inorganic brain damage. Now, you can say, well, that's a mock makes distinction, and so there's no prejudice. Or you can say, even if there is such a distinction, there was no need, that's what I took to be your earlier argument, is that there hadn't been enough indication that there was organic brain damage at that point in time. It's when you backed up to the, we need to look at the big picture and this is a terrible crime, that was the logical move that I found difficult to track. Are you with me? I am, and I apologize. Issues three, four, and five are sort of bleeding together right now. And so, there's an ineffective assistance of counsel claim, there's a trial court error related to not adding an additional expert at sentencing, and then there's a claim related to not getting funding from the district court. And I think right now we're concerned about four and five. Right, and I understand that. And so, my response to that would be that when you look at what the trial court had before him in terms of having sat through the trial and heard Dr. Fisher's testimony, and then this report is received that just notes a possibility of brain damage that seems to be contradictory to everything else that the trial court had heard, and it happens to be extremely remote in time, and you take all of that into account, I don't think there's an unreasonable application of federal law by the judge deciding not to grant an additional expert at that sentencing phase. At what point is the decision being made that you just referred to?  At what point in the proceedings, at what point in the progression of proceedings was that decision made when the one- During the sentencing phase. During the sentencing phase. I'm sorry, not sentencing, but sentencing hearing. The sentencing phase had already happened. It was during the sentencing hearing that Mr. Lewis, defense counsel, requested the additional- Well, the jury had already recommended the death penalty, but the trial court had not yet imposed it. Is that right? Correct. And it was at the hearing to consider whether the trial court was going to do that or not. That's where the motion was made, correct? Yes, that's correct. And at that point, did they have this report from many years before that Judge Sanchez had been referring to? Yes, yes. That's when they received it. The report was received mid-trial. Mr. Lewis doesn't specify an exact time period that I'm aware of. It was before that point that we're talking about. Right, but he basically- I think at the motion for a new trial hearing, which was sort of coupled with the sentencing hearing, he noted that I received it mid-trial. It was too late for me to do anything with it. I was in the middle of a capital trial. I understand. And so that's kind of the- I was just trying to get oriented. Sure, sure, sure. I understand. Can I ask you a question about the proper big picture here? When we were talking about the big picture, you went to the facts of the case. But isn't there a smaller big picture that is pertinent for resolution of this question with respect to trial court error? The big picture to look at to consider that is the amount of litigation evidence that, in fact, was presented on behalf of Mr. Hite, which would be Dr. Fisher, it would be the social worker's testimony, all of the information about his upbringing, his past, his difficulties. And then finally, the other part of the big picture, it seems to me, is that we're not reviewing the trial judge's decision here for abuse of discretion as we would if we were directly reviewing it. I mean, we're a federal court, and we're operating under habeas restriction. So is that not the right relevant big picture for this issue? Yes, Judge Givens, that is correct. And I would note there was an extensive mitigation case here. This was the one day, right? No, it was more than one day. The Commonwealth, the only sentencing evidence from the Commonwealth had to do with criminal history. The rest of the first, all of the second, and part, I think, of the third, Dr. Fisher, I believe, was on February 3rd. All of that came from, or all of that involved testimony from Hite's family members. The social worker, in particular, in 1994, did a particularly good job. I think she probably today would be referred to more as a mitigation specialist rather than just a social worker who happened to put all this together. But she had interviewed a lot of people and had done an extensive background study into Mr. Hite. The jury had a complete, full, accurate picture of him. They had a wealth of information about his family life and, in particular, his difficult upbringing. His mother testified twice, once in the guilt phase and once in the penalty phase. They heard from his sister. They heard from people that he worked for at the jail in correctional industries, making furniture. There was an extensive mitigation case put on for Mr. Hite, which included mental health evidence and, in particular, that he was suffering from an extreme emotional disturbance. And I understand that that was really the gist, that it was an extreme emotional EED claim there. But what I'm struggling with is the time in mitigation that came in. The factors that were raised there seemed to me to point to, or red flags, to what would be an actual organic, a brain damage claim. And yet, because, you know, what did they say, his father beating him with everything he could get a hold of. But what was missing from that, and what was not funded, was a neurologist, someone with the expertise to explain what all of that damage meant. And it meant, their argument, as I understand it, is that the desire was to show that he was brain damaged. I think everything else in there fits within that category. But I don't even see the trial court addressing that. The motion for new trial was, what, February 4? And I'm looking, and there was a hearing before the court that was held on March 7. I can't even find an order that addresses these mental health issues or the request for funding. And then, subsequent to that, I find nothing. I find motions for money. Give us some money and enable us to have a neurologist speak to his mental, his brain damage issues. But it was completely denied. Am I incorrect? Was there some opportunity for an expert to provide information on organic brain damage or to even investigate or meet with or evaluate Mr. Haight for those issues? Up to today. Yes, Dr. Fisher, that was his role. And again, they are asserting that, well, he couldn't diagnose this specific brain damage, which, yeah, he's not going to look at brain scans and that sort of thing. But he can still use the instruments available to him, and he did, and determined that there was no evidence of any neurological issues, no evidence of psychosis, no evidence of mental retardation. And he had IQ scores that ranged between somewhere in the mid-80s and the low 70s. And so, I understand the point you're trying to make, but I also, I don't think, the jury could not have had a, it would have been very difficult to have a more clear picture of exactly who they were dealing with. Well, I guess my core question is, Fisher is a clinical forensic psychologist, and he testified at trial, correct? Correct. Before the 1974 three-expert evaluation was even found, right? I don't know, because I don't, yeah, I don't know exactly when, again, because Mr. Lewis says it was received mid-trial, I don't know exactly what day he was received. It was received on January 22nd, and my understanding of the answer of counsel is that he did not raise it at trial because he was in the middle of the trial. Right, right. As soon as the trial was over, he raised it in a motion for a new trial. And it's from that point on that I never see a response from the court evaluating that need, and we obviously never see any authorization for funds that I think the Supreme Court in Ayesda, Judge Alito talking about the reasonable attorney would regard these investigated services as suspicious. They were sufficiently important to demonstrate that they were reasonably necessary, which falls into Aki, which Dunn said is clearly established law for the purposes of ADPA. I'm just struggling with why it's inappropriate to authorize that funding. Well, I would just point out that the Ayesda case that you just referred to is a Martinez v. Ryan, Torvino v. Thaler case. So you're looking at an underlying ineffective assistance of trial counsel claim. And again, here, when you look at that, that's where prejudice comes in. That's where the big picture comes in. That's where you look at the fact that as a defense attorney, you're entitled to rely on the opinions of experts. And this expert told him there were no neurological impairments. Psychologists. Right. And again, I realize he can't diagnose it. Your opposing counsel says a psychologist simply cannot be an expert on neurological damage. He said he can't diagnose it. But I don't think that prevents him from using the instruments that are available to him in his area of expertise and determining that further investigation is needed because there is some sort of indicator that shows that there is some sort of brain damage. In other words, I think that's the difference. And especially when you when you're again, when you're looking at the Ayesda case, also, the reason that that analysis happened was because the claim wasn't raised and it wasn't adjudicated on the merits. Here, we have an issue where we have an ineffective assistance of counsel claim that was adjudicated on the merits. So that case doesn't apply. I would agree with you. The Martinez angle of that case doesn't. The question is whether the opinion of Bakke and Ayesda speaks to what is reasonably necessary in accordance with 18 U.S.C. 3599-F. That is the language of that statute. But that statutory authorization for funding was denied. Right. And again, I would assert that the denial in the district court was based on the principles in Cullen v. Penholster. The denial at the trial court level was based on the fact that he had already been appointed an expert and the 1973 report merely noted a possibility. It did not go far enough that it would have required the judge to hire an additional or allow an additional expert. I think at this point, we should allow you an opportunity to say something about issues 9 and 10 if you want to. Okay. Thank you, Your Honor. I would simply note with regard to issue number 9, the theft by unlawful taking, the McClellan case that my opponent refers to talks about burglary. And in the burglary statute, there has to be the intent to commit a crime when you enter a dwelling. In the robbery statute, in the course of committing a theft, which occurred here, the defendant in this case used physical force on another with the intent of accomplishing a theft. And his argument is, well, he didn't intend to commit a theft. But actually, the testimony from Mr. Hite where he says that he didn't mean to do what happened is referring to killing both of these individuals. He's not talking about a theft there. So, there is still sufficient evidence to show that he intended a theft when he walked up to that car. And there isn't evidence that would have supported a theft by unlawful taking instruction. The difference there being in the burglary statute, the intent to commit a crime, not necessarily theft, versus in the robbery statute, the intent has to be to commit a theft. And I don't think his disclaimer that I didn't mean for it to happen with regard to when he was asked about killing these individuals refers to the theft. He's referring to his intent with regard to murder. And with respect to wanton murder, issue number 10, there are a number of issues with the procedural default of both the ineffective assistance of counsel claims. The McGinnis case that I cited in my brief is applicable and prevents any of these underlying claims from being available. So, there can't be ineffective assistance of counsel or ineffective assistance of appellate counsel when the underlying law doesn't support the error. And with that, I see my time is almost up. Mr. Gibbons, may I ask a question about one of the other issues? Just one question. Sure, sure. Mr. Cargill, I have a question about issue 8, which is whether the instructions, which I guess you agree were incorrect, whether they were harmless. And the instruction has to do with the lesser included offense of manslaughter. Is that ringing a bell? Yes, sir. Okay. And you did argue in your brief, if I'm correct, that the error in the instruction or the incorrectness in the instruction was harmless. Is that correct? It is. And here's my question, because we just have a little time. It's a little hard for me to see how it's harmless to have that instruction when the defendant has a right to a lesser included instruction under the law. If the defendant has a right to the lesser included instruction on the theory that the jury might find it sufficient to find the lesser included rather than the greater one, that's the whole reason for the right, right? Correct. Nobody likes to be convicted of anything, but they like it if it serves as a substitute for something worse, right? Sure. That's the underlying idea. And I'm just having trouble drawing. I wonder what your response is to the question as to how can it be, if he has the right to a lesser included instruction in a particular situation, doesn't he lose that right when the elements are wrongly laid out? No. That's my question. Right. My question. My answer would be no if the elements are laid out in a way that is favorable to the defendant. And here there was a technical error. I would argue that it was a non-prejudicial error because it in essence created a gap between the two statutes and would have allowed an acquittal where otherwise it wouldn't have existed. The easy answer to the harmless error analysis would look at just the fact that the jury found him guilty under the murder statute, so it found beyond a reasonable doubt absence of EED, so it didn't necessarily matter what was written in the manual. I don't know. It doesn't matter unless you think he has a right to a lesser included instruction. He has a right to a lesser included instruction. It doesn't say that it's harmless because the jury found on the greater included instruction. Because the whole idea is that if he had a lesser one, they might have opted for the lesser one. Well, you could also convict him of this lesser one, but you're going to have to show some weird things. Hypothetically, the necessary equivalent of not getting the lesser included, which is taking a chance that he won't get the bigger one. But in this instance, the error alleged was that it impermissibly shifted the burden to Mr. Hite when it in fact did not. If you look at the case, the Sandstrom case or the Mulaney case, both of those deal with a situation where it's obvious that a defendant was required to do more than they should have been required to do. In this instance, that wasn't the case. So as even though there was a technical error, it was a non prejudicial error that that actually was to Mr. Hite's benefit and didn't harm him. How exactly was it to his benefit? Because it created a greater burden of proof for the Commonwealth under both instructions. And also, it is helpful to look at the instructions as a whole, and you'll see that in instruction nine and the reasonable doubt instruction as well, that the burden of proof was always correctly laid at the feet of the Commonwealth. There was never any instance where the Mr. Hite was required to prove an element of the offense, or had the burden impermissibly shifted to him. And for that reason, it was a harmless error. Thank you. Thank you. Mr. and Mr. Hackett, you will each have your one minute for rebuttal. Your Honor, the warden makes two arguments that because there were bad facts in this case, no mitigating evidence would have changed the jury's verdict. And because defense counsel presented some mitigating evidence, it doesn't matter that didn't present more important mitigating evidence. Both of those arguments have been roundly and repeatedly rejected by the United States Supreme Court. There are numerous cases in our briefs that deal with exactly those two issues. And there are cases where the defense presented more mitigating evidence that they found that the lack of important mitigating evidence, and there's no more important mitigating evidence than organic brain damage, was prejudicial to the defense. The warden repeatedly says that this is just the possibility of brain damage, not the probability. The 1973 report, the doctors, after doing neuropsychological testing, said that it revealed symptoms of cortical dysfunction and brain damage. Dr. George Woods, a neuropsychiatrist, said there were clear indications of organic brain damage. Dr. Michael, a neuropsychologist, said that there were clear indications of organic brain damage. It's not the possibility, it's the probability. And I've never had a chance to present expert testimony to the court. Mr. Hackett. Thank you, Your Honor. I'd like to make one point about both of the Claims 9 and Claim 10. Regarding Claim 9, the right to the lesser theft instruction to the jury, the Attorney General a couple of times quoted one of the things that Mr. Haidt said, and that was, I didn't mean for it to happen. That is not what we're basing this issue on. Mr. Haidt was asked specifically, did you intend to kill these people? He said no. Did you intend to rob these people? He said no. That's what's the, is the equivalent of what occurred in the McClellan case, where Mr. McClellan said that he did not intend to commit a crime in the dwelling. So, it's very, he was asked a very specific question, and he answered. With regard to the, I'm sorry, with regard to Issue 8, the manslaughter instruction. The warden has argued that the erroneous... Make this brief because your time is up, but I understand that you're responding to a question that was asked by one of us, so we'll let you finish your answer, or your response. Thank you. I appreciate it, Your Honor. The point that I'd like to make is these instructions never placed the burden on the Commonwealth to prove anything, except in the murder instruction, they had to prove the absence of extreme emotional disturbance. Otherwise, the instructions told the jury, if you believe from the evidence and beyond a reasonable doubt, all of the following. They did not have, they did not place the burden on the Commonwealth for any of the elements, for any of the offenses, except in that one instance where they were told that the Commonwealth had the burden to prove the absence of EED in order to convict of murder. EED was Mr. Height's defense. It was described that way by the Kentucky Supreme Court. Therefore, he's the one that had to prove beyond a reasonable doubt that he was acting under the influence of extreme emotional disturbance, and that is the problem with the instruction. All right. We appreciate the argument that all of you have given. I note particularly that Mr. Bailey and Mr. Packett were both appointed to represent Mr. Height under the Criminal Justice Act. You do render an important service to the court as well as your client. We're very, very appreciative of your undertaking this representation. It's hard enough to take on a CJA case under any circumstances, but when it's a death penalty case, it requires the degree and extent of preparation that those cases do. We're especially appreciative and know how it has an impact on your practice and everything else you do.